**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SANDRA McCANDLESS,

        Plaintiff/Counter-Defendant,

v.                                                                          Case No. 08-14195

STANDARD INSURANCE COMPANY,                    HON. MARIANNE O. BATTANI
a subsidiary of STANCORP FINANCIAL
GROUP, INC., jointly and severally,

        Defendants/Counter-Plaintiff.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR
<u>JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Before the Court is Plaintiff Sandra McCandless' Motion for Summary Judgment (Doc. 102) and Defendant Standard Insurance Company's Motion for Judgment on the Administrative Record (Doc. 104; Doc. 105). Plaintiff, an Employee Retirement Income Security Act ("ERISA") plan participant, brought this action challenging Defendant plan administrator's denial of long term disability benefits. (Doc. 33). Defendant filed a counterclaim seeking to recover overpaid disability benefits based on plan provisions and Plaintiff's receipt of Social Security disability benefits. (Doc. 43). In her motion, Plaintiff asks the Court to reverse Defendant's decision to deny benefits for a variety of reasons. Defendant seeks an affirmance of its decision and a $23,332.00 judgment on its counterclaim. The Court has reviewed the record and finds oral argument will not aid in the resolution of this dispute. <u>See</u>, E. D. Mich. LR 7.1(f)(2). For the reasons that follow, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

**I.      BACKGROUND**

Defendant Standard Insurance Company issued to Plaintiff Sandra McCandless' former employer, Countrywide Home Loans, a Group Long Term Disability Insurance Policy ("the Policy"). Plaintiff was insured under that ERISA governed Policy. The Policy's "Allocation of Authority" provision confers Defendant with discretionary authority to determine benefit eligibility. (0044-45)[1]

To file a disability claim under the Policy, a claimant must complete a three-part form, consisting of an Attending Physician's Statement (signed by the treating physician), an Employee's Statement (signed by the claimant), and an Employer's Statement (signed by the employer). (0042).

The Policy provides two different definitions of disability. During the first twenty-four months in which benefits are paid, the "Own Occupation Definition of Disability" applies:

> You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:
>
> 1.    You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
>
> 2.    You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

(0032). After that period, the "Any Occupation Definition of Disability" applies:

> You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.

(0032) (emphasis added). The Policy defines the term "Material Duties" as "essential tasks, functions and operations, and the skills, abilities, knowledge, training, and

---

[1] Citations to "(0___)" refer to the last three digits of the corresponding Bates numbered page of the Administrative Record, Doc.59.

2

experience, generally required by employers from those engaged in a particular occupation that cannot be modified or omitted." (0032). "Any Occupation" means:

> any occupation or employment which you able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you an be expected to earn at least 80% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

Id. The Policy also provides that no Long Term Disability ("LTD") benefits "will be paid for any period of Disability when you are not under the ongoing care of a physician in the appropriate specialty as determined by us" and that "payment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by … 1. Mental Disorders." (0334; 0041-42).

On April 18, 2005, Plaintiff filed a disability claim with Defendant. (0721). Her claim paperwork was incomplete - she only submitted the Attending Physician's Statement, signed by Dr. Jamsek, Plaintiff's psychiatrist. Jamsek diagnosed Plaintiff with a "Major Depressive Illness" and described her symptoms as "depression, anxiety, low energy, feeling helpless." Id. On May 11, 2005, after reviewing her initial filings, Defendant sent Plaintiff a letter explaining that it could not consider the claim until she provided an Employer and Employee Statement and asked her to file those forms. (0388). On May 26, 2005, having not received any additional paperwork, Defendant sent her another letter, again requesting the missing forms. (0384). On June 14, 2005, Plaintiff submitted her Employee Statement. (0382). In it, she identified her disability as "severe depression." Id. Countrywide eventually filed the Employer Statement. Having filed all the necessary paperwork, Defendant reviewed her claim.

3

Defendant granted Plaintiff Short Term Disability ("STD") benefits on June 28, 2005. (0376). Defendant made those benefits retroactive to February 2, 2005. STD benefits are limited to 180 days. Defendant encouraged Plaintiff to see if she was eligible for additional benefits under the Policy, such as LTD. Jamsek sent Defendant additional records. (0697).

On October 3, 2005, Defendant granted Plaintiff twenty-four months of LTD benefits pursuant to the Policy's Mental Disorders provision. (0351). Defendant consulted with Dr. Toenniessen, a psychiatrist, to review her LTD claim. After reviewing the available medical records and discussing Plaintiff's condition with Jamsek over a telephone conversation, Toenniessen opined that Plaintiff's psychiatric symptoms prevented her from working. (0371). About two months after granting her LTD benefits, on January 17, 2006, Defendant sent Plaintiff a letter informing her that those benefits expire on July 31, 2007, and that if she has any information that shows she is disabled by conditions not covered under the Mental Disorders provision, she should send it to Defendant as soon as possible. (0332).

In an effort to extend her LTD benefits beyond the twenty-four month period, Plaintiff supplemented her claim file with additional records. On February 21, 2006, Standard received a Physician's Report from Jamsek. (0686). Jamsek diagnosed Plaintiff with "Major Depressive Illness, severe," "Anxiety disorder," and "Anxiety [disorder] with panic attacks." Under General Medical Conditions, Jamsek identified "spondylitis" and "tachycardia." On February 28, 2006, Plaintiff sent a completed Activities of Daily Living form, describing her current medical condition as: "[D]epression – and most recently shortness of breath and rapid heart rate. Adjusting medication to treat. Working very closely [with] doctor to improve condition." (0309). In that form, Plaintiff also explained that she

4

was seeing a doctor for "Depression (severe)," "Ankylosing Spondylitis," and "Recently – being treated for rapid heart rate."  In a May 22, 2006 file review, Defendant determined that the medical information supported only an ongoing psychiatric disability.  (0308).  As such, her benefits were set to expire on July 31, 2007.

On July 14, 2006, Defendant asked Plaintiff to file a Social Security disability ("SSD") claim through its agent, Allsup.  (0307).  Plaintiff appointed Allsup as her Social Security claims representative and filed her claim, including reports only from Wilkinson and Jamsek. (0165).  On March 15, 2007, the Social Security Administration denied her claim. Allsup sent Engelmann a Physical Capacities Evaluation ("PCE") form to fill out so Plaintiff could refile.  (0166-169).  Engelmann completed the PCE form and Plaintiff reapplied.[2]

In May 2007, Defendant sent Plaintiff two letters informing her of the expiration date and requesting that she submit additional information if she has a disability claim not subject to the Mental Disorder provision.  (0079; 0284).  When Plaintiff received the first letter, she immediately called Kathryn Matson (Plaintiff's case manager) and asked Defendant to consider a LTD claim based on her ankylosing spondylitis ("AS").[3]  (0291). Plaintiff sent Defendant a letter on June 15, 2007 that summarized her conversation with Matson and accused Defendant of overlooking and not considering her claim based on her

---

[2]  On April 28, 2009, more than a year after the administrative record closed, the Social Security Administration granted Plaintiff SSD benefits.

[3]  Ankylosing spondylitis is a chronic inflammatory disease of the axial skeleton manifested by back pain and progressive stiffness of the spine.  Inflammatory changes occur around the sites where ligaments are inserted into the bone, causing a fibrous or bony bridging of the joints.  Arthritis of the hips, shoulders and peripheral joints may occur as well as anterior uveitis, which drastically affects eyesight (0423-0428).

AS.  (0280).  Defendant sent her additional forms to fill out regarding her AS based LTD claim.  (0288).

Plaintiff sent a variety of written records in support of her LTD claim based on AS to Defendant.  She submitted a Health Provider Verification Statement, specifically noting the doctors who treated her for AS (0281).  Plaintiff told Defendant that she would send records from Engelmann, Jamsek, and Wilkinson, her treating doctors.  (0280).  Defendant received those records, the relevant aspects are as follows:

> Engelmann[4] summarized his treatment of Plaintiff and opined that she needs "continued intensive treatment for her depression and anxiety at the present time" and that she "continues to manifest classic symptoms of low back pain and stiffness," "joint stiffness," "constant pain," and "ocular manifestations" which has severely limited her activities, leaving her in "pain with every movement." (00651-652).  Engelmann considered treatment of Plaintiff's psychiatric condition a "top priority" and the only medical evidence he provided was a blood test that confirmed the presence  of a gene marker associated with individuals prone to AS.  (00652; 0661).

> Jamsek said that since the onset of treatment, Plaintiff "is physically very limited due to exacerbation of spondylitis, which gives her severe back pain, and uveitis, which impairs her vision (634).

> Wilkinson, Plaintiff's ophthalmologist, initially examined her for uveitis, an inflammation of the eye, which he treated with steroids to quell the inflammation. (0679; 0594).  At an office visit in early December, 2004, Wilkinson referred Plaintiff to a rheumatologist for treatment of AS. (0629). Plaintiff never sought treatment with a rheumatologist.  Wilkinson noted that Plaintiff's uveitis symptoms continuously improved between January and August in 2005.  During a May 2007 examination (the first time Wilkinson had seen Plaintiff in over two years), Wilkinson noted her complaints of headaches (lasting 3 weeks), nausea, numbness in the arms, dry eyes and decreased visual acuity.   His assessment was "myopia/presbyopia" (near-sightedness) and dry eyes, which he treated with lubricating drops. (0669).

---

[4]  Dr. Engelmann, a general family physician, is Plaintiff's primary physician.

On August 6, 2007, Defendant denied her LTD claim based on her AS symptoms. (0264). In reaching its decision, Defendant consulted with Dr. Dickerman, a physiologist and board-certified neurologist. (0638). After reviewing her entire file, Dickerman concluded that Plaintiff has

> chronic depression, anxiety, dysthymic disorder and carries the diagnosis of ankylosing spondylitis on the basis of positive HLA-B27. There has been no documentation of a physical examination regarding this patient or documentation of her activities. Therefore, at this time, there has been no evidence submitted to indicate that this patient has any specific limitations or restrictions secondary to the diagnosis of ankylosing spondylitis or any other physical diagnosis.

(0639). Dickerman recommended that if Plaintiff received treatment by a rheumatologist, Defendant should obtain those records and submit them for evaluation by a consulting rheumatologist. (0261). Defendant told Plaintiff that it would forward this decision to its Administrative Review Unit ("ARU") for further review. (0265).

The ARU recommended that Defendant reexamine its decision to deny Plaintiff's claim. The ARU determined that Plaintiff and her treating doctors might not have submitted all of the available medical evidence. (0258-261). Acting on that observation, Defendant contacted Plaintiff and Engelmann in a search for missing records. Defendant specifically sought any records from treating doctors not on Plaintiff's forms and any records from a rheumatologist. Plaintiff confirmed she never visited a rheumatologist. (0253). Engelmann submitted a letter in which he explained that, based on his observations, Plaintiff suffers from AS. (0261). Defendant obtained two MRI's of Plaintiff's spine, one from 2001 and the other from 2007. (0623; 0622). The 2001 report stated "no evidence of fracture or intrinsic or osseous abnormalities or spondylolysis or spondylolisthesis." (0623). The 2007 report stated (after observing that her sacroiliac joints were fused), "[a]bsence of the sacroiliac

joints can reflect ankylosing spondylitis although the other signs of this disease in the lumbar area are not present." (0622). Defendant also obtained medical records from Dr. Biddinger, an internist who examined Plaintiff for heart palpitations. (0565-571). Defendant sent this newly acquired information to Dickerman for a second review. (0538-540).

Defendant affirmed its denial of Plaintiff's LTD claim on October 12, 2007. (0194-196). After again reviewing Plaintiff's file, Dickerman concluded "the available records, regardless of a diagnosis for this pain, do not provide documentation of a significant pain disorder or specific limitations or restrictions that would, at any point, provide limitations and restrictions to prevent full-time sedentary work activities." (0540).

After Defendant informed Plaintiff of its decision, Plaintiff again filed additional records in support of her claim. On November 19, 2007, Engelmann submitted a letter describing his disappointment with Defendant's decision and further explained his observations that support his AS diagnosis. (0534). Enclosed in that letter, was a x-ray of Plaintiff's pelvis, taken by Dr. Kellam, a radiologist. (0536-537). Though Kellam's initial opinion was that the pelvis showed no signs of disease, three weeks later, he attached an addendum that explained his findings actually support an AS diagnosis. Id. Engelmann also submitted new medical records that chronicled Plaintiff's complaints of pain from July 2007 to November 2007. (0527; 0525; 0524; 0523; 0518; 0517).

Defendant again affirmed its denial. Dickerman, after reviewing Plaintiff's file for a third time, concluded that the newly submitted records do not alter his previous findings. (0503-506). He explained that Kellam's "addendum" merely confirms the findings in the 2001 and 2007 MRIs. He also questioned Engelmann's non-treatment of AS despite Engelmann's opinion that her AS was severe: "It makes little sense, if this patient has

8

significant pain from [AS], that the treatment for the condition would be deferred simply because she is being treated for depression...." (0506). Defendant sent Plaintiff's file to the ARU for additional review. (0183).

Plaintiff sent additional records to the ARU before it began its second review. Plaintiff's attorney asked Engelmann to transcribe his handwritten notes and send them to Defendant. Engelmann refused to do so. He did, however, send Defendant a letter stating that his exam summaries were more than sufficient to support her AS diagnosis. (0153). He also enclosed a copy of the PCE he filled out in support of Plaintiff's SSD claim. He described the PCE form as a "full physical evaluation" of Plaintiff's physical abilities. Defendant, noting that the PCE is simply a "check-a-box" form, asked Plaintiff to provide the raw data on which Engelmann relied on to complete Plaintiff's PCE form. (0148-149). Plaintiff never sent the underlying "raw data." Engelmann's letter suggested that Defendant send Plaintiff's claim to a rheumatologist for review. Id. Defendant agreed and had Dr. Ingram, a board-certified rheumatologist, review her entire file as part of its administrative review process. (0182).

On March 7, 2008, Defendant issued its final decision denying Plaintiff's LTD claim. (0126-133). In an eight-page opinion, Dr. Ingram concluded that if Plaintiff's AS symptoms were as severe as Engelmann had observed, "a prudent patient and/or primary care physician would direct them to specialty care [a rheumatologist] that would enable them to receive treatment to allow them to continue to work." (0414). She also found that "the fact that [Plaintiff] has not sought specialty care undermines the severity of restriction or pain experienced by [Plaintiff], as does the fact that she is not on nonsteriodal anti-inflammatory drugs...." (0413). Ingram ultimately concluded that Plaintiff's medical records do not

9

support a finding that her AS symptoms preclude her from working a sedentary occupation "particularly since there are no physical exams, specialty evaluations, nor actual observations of functional limitations." (0413).

On March 18, 2008, pursuant to Section 500.2213(c) of Michigan's Insurance Code, Defendant employee Walt Henry (a supervisor) reviewed and affirmed the final decision to deny Plaintiff LTD benefits. (0124). He specifically noted that her file had "no physical exams, special evaluations, nor actual observations of functional limitations during [the applicable] time period" and that Plaintiff failed to meet the "'Care of a Physician' policy requirement because she did not consult with a rheumatologist." Id.

After exhausting her administrative remedies under ERISA, Plaintiff filed the instant action to overturn Defendant's decision. (Doc. 1; Doc. 33). Subsequent to the closure of the administrative record ("AR") and the filing of this lawsuit, on April 28, 2009, the Social Security Administration granted Plaintiff SSD benefits based on a combination of her mental and physical impairments. (Doc. 102, Ex. 1). Pursuant to the Policy's "Deductible Income" provision (0037-38), Defendant filed a counterclaim seeking to recover overpaid disability benefits based on Plaintiff's receipt of SSD benefits. (Doc. 43). Defendant calculates that it overpaid Plaintiff's disability benefits from January 2006 through July 2007 in the monthly amount of $1,228, totaling $23,332.00.

Plaintiff filed a Motion for Summary Judgment (Doc. 102) and Defendant filed a Motion for Judgment on the Administrative Record (Doc. 104; Doc. 105). The dueling dispositive motions are now before the Court.

10

III.    **STANDARD OF REVIEW**[5]

A.    **ERISA**

A district court reviews an ERISA plan administrator's denial of benefits *de novo*, unless the plan gives the administrator discretionary authority to determine eligibility for benefits. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Cox v. Standard Ins. Co., 585 F.3d 295, 299 (6th Cir. 2009). If the plan gives the administrator discretionary authority, the Court applies the highly deferential "arbitrary and capricious" standard of review. Cox, 585 F.3d at 299. "The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Schwalm v. Guardian Life Ins. Co. of America, 626 F.3d 299, 308 (6th Cir. 2010) (quoting Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003)). Moreover, even when a claimant has introduced evidence that might be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits because of the plan's provisions, then the decision is neither arbitrary nor capricious. Id. (citing Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir. 2000). Accordingly, a court must uphold the administrator's decision if it is the result of a deliberate, principled reasoning process and is supported by substantial evidence. Id.

---

[5] Summary judgment procedures are inappropriate for ERISA actions involving disputed benefit awards. Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 619 (6th Cir.1998) (Gilman, J., concurring); see also, University Hospitals of Cleveland v. Emerson Electric Co., 202 F.3d 839, 845 n. 2 (6th Cir. 2000). Accordingly, the Court treats the parties' dispositive motions as motions for judgment on the administrative record, excepting from that characterization the portion of Defendant's motion that seeks summary judgment on its counterclaim. On that claim, the Court applies Rule 56 standards.

(quoting <u>Baker v. United Mine Workers of Am. Health & Ret. Funds</u>, 929 F.2d 1140, 1144 (6th Cir. 1991).

An important conflict of interest consideration tempers such a deferential standard of review. When the plan administrator both evaluates claims for benefits and pays the claims it approves, the administrator is operating under a structural conflict of interest that must be weighed as a factor in the Court's determination of whether the denial of benefits was arbitrary or capricious. <u>Id</u>. at 311 (quoting <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008). The Supreme Court has explained that the existence of such a conflict does not heighten the standard of review; it is "but one factor among many that a reviewing judge must take into account." <u>Metropolitan Life</u>, 554 U.S. at 116; <u>see also</u>, <u>Calvert v. Firstar Fin., Inc.</u>, 409 F.3d 286, 293 (6th Cir. 2005) (noting that the Sixth Circuit has consistently viewed a conflict of interest as a factor to consider in applying the "arbitrary and capricious" standard).

Here, Plaintiff concedes that the Policy contains language sufficient to grant discretion to Defendant. Further, Defendant both grants eligibility for benefits and pays benefits. Therefore, the Court reviews this case under the highly deferential "arbitrary and capricious" standard, while bearing in mind that a structural conflict of interest exists.

### B.    Rule 56

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. Pro.</u> 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52, (1986). Rule 56

mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. See, Fed. R. Civ. P. 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

## IV.    ANALYSIS

### A.    Plaintiff's Challenge to Defendant's Decision

The ultimate question in any disability case on "arbitrary and capricious" review "is whether the plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not 'disabled' within the plan's terms." Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618 (6th Cir. 2006). Here, since Plainitff had already received twenty-four months of LTD benefits under the Mental Disorder provision, she carried the burden of showing "disability" under the "Any Occupation Definition of Disability." (0032; 0042-43; 0126); see also, Donatiello v. Hartford Life and Acc. Ins. Co., 344 F.Supp.2d 575, 580 (E.D. Mich. 2004) (Plaintiff bears the burden of proving disability under the ERISA Plan). Defendant concluded that Plaintiff failed to carry that burden because she did not submit clinical exam findings documenting specific functional limitations to support her claimed inability to perform sedentary work. (Doc. 104 at 3). Defendant also explains it denied her claim because she failed to satisfy the Policy's requirement of obtaining ongoing care and treatment by a rheumatologist. Id. Plaintiff asks the Court to review that decision.

The Court begins by organizing Plaintiff's varied objections into five general categories. First, she contends that a structural conflict of interest unfairly influenced Defendant's decision. Second, she argues that Defendant's reviewing consultants were biased against her claim. Third, she challenges Defendant's analysis of the medical evidence. Fourth, she accuses Defendant of arbitrarily interpreting the Policy's "Care of Physician" provision. Finally, Plaintiff suggests there is evidence outside the AR that supports her claim.

### 1.   Conflict of Interest

Though Defendant made its decision to deny Plaintiff's LTD claim under a structural conflict of interest, it does not follow that the Court should automatically reverse that

decision.  Plaintiff provides no evidence of Defendant's rate of claims denials, no evidence that Defendant based its decision on the costs associated with paying out her LTD claim, and no evidence that Defendant portrayed Plaintiff in a negative light to the reviewing consultants, Dickerman and Ingram.  See, DeLisle, 558 F.3d 440, 445 (6th Cir. 2009); Cochran v. Trans-General Life Ins. Co., 12 F.App'x. 277, 281 (6th Cir. 2001) ("mere allegations of the existence of a structural conflict of interest are not enough; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits.").  Moreover, the AR severely weakens the conflict of interest argument.  Defendant paid six months of STD benefits, twenty-four months of LTD benefits, and actively assisted Plaintiff in extending her LTD claim based on her AS symptoms. Notably, Defendant considered all of the evidence that Plaintiff submitted.  See, Killian v. Healthsource Provident Adm'rs, Inc., 152 F.3d 514, 521 (6th Cir. 1998) (finding that a plan administrator was improperly influenced by a structural conflict of interest when it refused to consider evidence submitted by a claimant).  In fact, on multiple occasions Defendant reached out to Plaintiff's doctors in a search for medical records that could support her claim.  Also, Defendant reviewed Plaintiff's LTD claim six times.  The record provides no indication that the structural conflict of interest improperly influenced Defendant's final decision.

## 2.    Bias

Both parties accuse their opponent's doctors of prejudicial bias.  (Doc. 102 at 17-20; Doc. 112 at 4-5).  Plaintiff describes Dickerman as Defendant's "go to guy" when it comes

15

to disability claims. She explains his financial connection with Defendant (Dickerman earned about thirty four percent of his income from Defendant in 2006 and 2007) and argues, "presumably," that he issues disability opinions in Defendant's best interest. Regarding Ingram, Defendant was one of two sources of her medical income during 2006 and 2007 and that since September 2009, Ingram has been an employee of Defendant (Assistant Medical Director). Plaintiff claims Dickerman and Ingram are Defendant's employees, not "independent" contractors. On the other hand, Defendant characterizes Engelmann as a twice bankrupt general practitioner who has a financial incentive to act as Plaintiff's disability advocate.

Consulting physicians who are repeatedly retained by benefits plans "may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." Elliott v. Metro. Life Ins., 473 F.3d 613, 620 (6th Cir. 2006) (internal quotations marks and citations omitted). However, the Supreme Court has explained that a claimant's treating physician may also have an incentive to make a finding of "disabled." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003). In Black & Decker, the Court considered these dueling motivations before ultimately refusing to read into ERISA cases a "treating physician rule," which would require a plan administrator to accord a patient's treating physician's opinion special deference. Id. at 831-32. Relatedly, the Sixth Circuit has said that in order to support an allegation of plan-chosen reviewer bias, a party must provide statistical evidence that the reviewer consistently opined that claimants were not disabled. Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston, 419 F.3d 501, 508 (6th Cir. 2005).

16

Neither party has a convincing bias argument. Defendant's suggestion that Engelmann's financial condition influenced his disability opinion is without evidentiary support. Likewise, Plaintiff presents no evidence that Defendant monetarily influenced Dickerman and Ingram to deny her claim. Further, she presents no evidence that Dickerman or Ingram "consistently" issued opinions adverse to disability claimants. See, Morris v. American Electric Power Long-Term Disability Plan, 2010 WL 4244120 (6th Cir. Oct. 15, 2010) ("Kalish requires evidence that reviewers *consistently* opine that claimants are not disabled...." (emphasis in original)). Also, Plaintiff's statement that Ingram read Dickerman's report before she conducted her review, thereby improperly influencing her opinion, is misleading. (Doc. 110 at 6). In Ingram's "Physician Consultant Memo," she acknowledges only that Plaintiff's file contained two memos drafted by Dickerman. (0407). Plaintiff's citations to the AR do not support her argument that Ingram read those memos or was influenced by them - Ingram simply acknowledged their existence. The competing conclusory allegations of bias carry little weight in the Court's analysis.

### 3. Medical Evidence

The record reveals that Defendant denied Plaintiff LTD benefits after it reviewed her claim multiple times. Dickerman reviewed her file three times. The ARU reviewed and remanded her file for additional records. After Defendant obtained those additional records, the ARU had Ingram review her file. Henry conducted a sixth and final review pursuant to MCL 500.2213(c). Defendant explains it denied her claim because she failed to submit clinical exam findings and objective test results documenting specific function limitations to support a claim that her AS prevented her from performing the "Material Duties" of "Any Occupation."

17

Plaintiff attacks Defendant's review of the medical evidence on many fronts. First, she objects to Dickerman and Ingram's rejection of Engelmann's disability opinion and questions their interpretation of her medical records. As the Supreme Court has explained, nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker, 538 U.S. 822, 831 (2003). In the Sixth Circuit, however, a plan may not summarily reject the opinions of a claimant's treating physician, but must instead give reasons for adopting an alternative opinion. Elliott v. Metro. Life Ins., 473 F.3d 613, 620 (6th Cir. 2006). An administrator' need not credit the disability opinion of a claimant's treating physician if that opinion lacks objective medical evidence. See, Boone v. Liberty Life Assur. Co. of Boston, 161 F.App'x 469, 473 (6th Cir. 2005). Moreover, "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 166 (6th Cir. 2007).

Here, Defendant did not arbitrarily reject Engelmann's disability opinion nor capriciously review the available medical records. Dickerman and Ingram's written opinions show they used a deliberate and principled reasoning process to arrive at their conclusions. (0638-639; 0538-541; 0503-506; 0407-0415). Throughout eighteen pages, the consultants methodically reviewed Plaintiff's entire claim file. The Court specifically notes the following observations:

> [N]o evidence submitted to indicate that [Plaintiff] has any specific limitations or restrictions secondary to the diagnosis of AS or any other physical diagnosis. (July 2007, 0639).

> [T]he available records, regardless of a diagnosis for this pain, do not provide documentation of a significant pain disorder or specific limitations or

restrictions that would, at any point, provide limitations and restrictions to prevent full-time sedentary work activities. (October 2007, 0540).

[N]o documentation of significant pain disorder, as reflected in the interventions performed. (December 2007, 0505).

While it is probable that [Plaintiff] has been symptomatic from her AS for a long time, these records do not support that this is significantly physically limiting from a full-time sedentary occupation from February 2005 through July 2007, particularly since there are no physical exams, speciality evaluations, nor actual observations of functional limitations. (February 2008, 0413).

Ultimately, the reviewing consultants concluded that though Plaintiff's file contained multiple reports of pain, objective medical evidence did not support those subjective complaints. Also, Defendant's seven page letter sent to Plaintiff clearly explains the specific reasoning behind its decision to deny her claim. (0126-133). Defendant's explanations were clearly reasonable given the AR.

Next, Plaintiff objects to Defendant's "file only review" of her claim. There is nothing "inherently objectionable about a file review by a qualified physician in the contest of a benefits determination." Calvert v. Firstar Fin., Inc., 409 F.3d 286, 296 (6th Cir. 2005); see also, Bennett v. Kemper Nat. Services, Inc., 514 F.3d 547, 555 (6th Cir. 2008) (file reviewers should adequately explain why they reach decisions contrary to record evidence and if they rely on adverse credibility findings, explain why there is reason to doubt the applicant's credibility); Davis v. Unum Life Ins. Co. of America, 444 F.3d 569 (7th Cir. 2006) ("In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation."). However, a "file only review" is a factor in the Court's review. Smith v. Continental Cas. Co., 450 F.3d 253, 263 (6th Cir. 2006).

In this case, Defendant's "file only review" was sufficient.  As discussed above, Dickerman and Ingram thoroughly explained why they disagreed with Engelmann's disability opinion - the sole treating doctor who opined that Plaintiff was disabled.  They had unrestricted access to the available medical records; there is no evidence Defendant held anything back.  Defendant's aggressive record search twice caused Dickerman to supplement his original decision.  The consultants' opinions reasonably questioned the severity of Plaintiff's pain and functional limitations by pointing out: (1) the lack of objective medical records; (2) the fact that she did not see a rheumatologist, and (3) the pharmacy records which suggest that Plaintiff's prescription fill rate was not indicative of someone who had severe pain.

Plaintiff next suggests that Defendant should have ordered an independent physical exam.  Though the Policy gives Defendant that option, this circuit has never held that a plan administrator must hire a physician to undertake an independent review of an applicant's records before denying benefits.  See,  Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376 (6th Cir. 1996); see also, Wages v. Sandler, O'Neill & Partners, L.P., 37 F.App'x 108 (6th Cir. 2002).  Plaintiff carried the burden of showing she was disabled under the Policy.  As the AR demonstrates, Defendant helped shoulder that burden by actively assisting Plaintiff with the development of her claim.  She cannot explain away her ultimate failure to establish disability by arguing that Defendant should have also ordered an independent exam.

The Court need not respond to Plaintiff's varied arguments that the AR contains medical evidence that supports her claim.  This case is not on *de novo* review.  The Sixth Circuit teaches that even if a claimant has some evidence that "may be sufficient to support

a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious." Schwalm, 626 F.3d at 308. Even assuming that Plaintiff has some evidence that supports her claim, after reviewing the quantity and quality of the medical evidence, the Court finds that Defendant has offered a reasonable explanation for its decision to deny Plaintiff LTD benefits. Accordingly, Defendant's final decision is neither arbitrary nor capricious.

### 4.   Policy Interpretation

In addition to the lack of objective medical evidence, Defendant has a second reason to explain its denial of Plaintiff's claim - she did not obtain ongoing care by a rheumatologist as required under the Policy's "Care of Physician" provision. That provision specifies:

> You must be under the ongoing care of a Physician in the appropriate specialty as determined by us during the benefit waiting period. No LTD Benefits will be paid for any period of Disability when you are not under the ongoing care of a physician in the appropriate specialty as determined by us.

(0042). After Plaintiff began her LTD claim based on her AS in June 2007, Defendant determined that the appropriate medical specialist for treatment of AS is a rheumatologist. The record shows that Wilkinson referred Plaintiff to a rheumatologist and that Wilkinson told Engelmann of that referral in early December 2004. (0629). Though Plaintiff acknowledged that she had been advised to consult with a rheumatologist, for personal reasons, she admits that has she never obtained any care by a rheumatologist. (0181). Since Plaintiff never obtained the appropriate care, Defendant concluded she was ineligible for LTD benefits by operation of the "Care of Physician" provision.

Plaintiff disagrees with Defendant's interpretation of that provision. She says Defendant failed to determine the "appropriate specialty" within her "benefit waiting period,"

which was between February 2, 2005 and July 31, 2005. She argues that Defendant failed to inform her of what speciality it chose in a timely fashion. She also claims that an ophthalmologist is an "appropriate specialty" for treatment of AS and that she complied with that provision having seen Wilkinson (an ophthalmologist) several times.

A reviewing court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." Gismondi v. United Techs. Corp., 408 F.3d 295, 298 (6th Cir. 2005) (citations omitted). Defendant's interpretation is rational. The provision clearly states that no LTD benefits will be paid for *any period* of disability when a claimant is not under care of an appropriate specialist. Defendant reasonably concluded that a rheumatologist was an appropriate specialist. (0412-413). Defendant's ARU, before conducting a review of her claim, informed her that a rheumatologist is that appropriate specialist and that a consultation with such a specialist could help support her claim. (0181). Despite that advice, Plaintiff never saw a rheumatologist. The Court cannot say that Defendant's interpretation of the "Care of Physician" was irrational. Furthermore, even if the Court were to agree that the "appropriate specialist" was an ophthalmologist, Wilkinson's treatment notes undermine Plaintiff's claim. Those notes clearly show that Plaintiff's uveitis (an AS symptom) continuously improved throughout 2005. (0671, 0673, 0675). Also, when she returned to Wilkinson in May 2007, after not seeing him for nearly two years, the doctor's assessment was dry eyes and myopia/presbyopia, which he treated with eye drops. (0669). Such a diagnosis does not support a finding of disabled under the Policy.

### 5.    Evidence Outside the AR

Plaintiff asks the Court to consider three documents outside the AR in its review of Defendant's decision: (1) an "Employee Statement," allegedly faxed to Defendant on April 15, 2005, in which Plaintiff describes her AS symptoms (Doc. 106; Ex. C; Ex. D); (2) her favorable Social Security Decision (Doc. 102 at 24), and (3) Engelmann's transcribed notes (Doc. 102 at 15).

"A court may consider only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms. The court's review is thus limited to the administrative record." Schwalm, 626 F.3d 299 at 309 (citing Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 618 (6th Cir.1998)). "The only exception to the ... principle of not receiving new evidence at the district court level arises when consideration of that evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." Wilkins, 150 F.3d at 618.

The Court cannot consider the proffered documents in its review because they are not in the AR. The Wilkins exception does not apply here because Plaintiff presented virtually no evidence of procedural violations. Plaintiff's complaint does not allege a lack of due process, administrator bias, or any other procedural deficiency, such as a failure to follow plan notice provisions. Nor does she challenge the process in which Defendant used to obtain her medical records. See, Moore v. Lafayette Life Insurance. Co., 458 F.3d 416, 430 (6th Cir. 2006). Notably, Plaintiff never filed a motion to supplement the AR with the proffered documents. Instead, she spreads her request throughout motion briefs. In the context of those briefs, it becomes clear that Plaintiff seeks to include these documents as

23

further medical evidence of her LTD claim.  As such, they are substantive in nature and do not fall within the narrow <u>Wilkins</u> exception.

Relatedly, Plaintiff's eleventh-hour allegation that Defendant failed to produce the entire AR is an insufficient basis upon which to challenge the legitimacy of that record. (Doc. 106 at 2; Doc. 110 at 5).  Despite having the AR for five months before filing the instant action, she did not include this procedural challenge in her complaint.  She did not include her "incomplete production" theory in her amended complaint.  By that time, she had been in possession of the AR for over one year.  She did not even include this argument in her principal motion, rather, it appears for the first time in her responsive briefs. Nearly every ERISA claimant could comb the AR for an ambiguous entry and suggest that a plan administrator has not produced the entire AR.  <u>See</u>, <u>Fendler v. CNA Group Life Assur. Co.</u>, 247 F.App'x 754, 758 (6th Cir. 2007).

Regarding the "missing" April 15, 2005 "Employee Statement," assuming it should have been included, and thus Dickerman and Ingram's review was based upon an incomplete record, Plaintiff must show how that shortcoming ultimately made Defendant's denial arbitrary and capricious.  <u>See</u>, <u>Moon v. Unum Provident Corp.</u>, 405 F.3d 373, 381 (6th Cir.2005) (the court must "ask whether, in light of the administrative record as a whole, the explanation for the decision to deny or terminate benefits is rational.").  Plaintiff failed to make that showing.  In light of the entire record, even assuming the AR should have included that document, it is clear that the missing "Employee Statement" did not fundamentally undermine the consultants' disability opinions nor prevent her from developing a LTD claim based on her AS symptoms.

### B.    Defendant's Counterclaim

24

Defendant is entitled to a $23,332.00 judgment on its counterclaim. The Policy's "Deductible Income" provision states that any long term disability benefits payable to a participant will be reduced by any amount received by the participant because of that participant's disability under The Federal Social Security Act. (0037). The Policy requires a participant to notify Defendant of the amount of SSD benefits after the Social Security Administration has approved such a claim and expressly states: "You must repay us for the resulting overpayment of your claim." (0038).

After Plaintiff exhausted her administrative remedies, she received a retroactive award of SSD benefits beginning January 2006 in the monthly amount of $1,228.00. (Doc. 104, Ex. B at 1). Defendant paid monthly disability benefits to Plaintiff for twenty-four months, from August 1, 2005 through July 31, 2007, in the monthly amount of $8,950.00. (0052). After applying the applicable provisions, Defendant calculated that it overpaid Plaintiff's disability claim from January 2006 through July 2007 in the monthly amount of $1,228, totaling $23,332.00. Plaintiff does not respond to Defendant's counterclaim arguments.

An ERISA fiduciary may bring a civil action "to obtain other appropriate equitable relief ... (ii) to enforce any provisions of ... the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). In Sereboff v. Mid Atlantic Medical Services, Inc., 547 U.S. 356, 361-69 (2006), the United States Supreme Court held that a claim for the reimbursement of overpaid funds may, in certain circumstances, qualify as an equitable lien under ERISA and an action for such recovery may be brought under § 502(a)(3)(B). In Sereboff, the Court suggested that a fiduciary seeking enforcement of an equitable lien under ERISA must base its repayment claim on an plan provision that has "specifically identified a particular

fund, distinct from [the beneficiary's] general assets ... and a particular share of that fund to which [the fiduciary] was entitled." Id. at 364.

In Gilchrest v. Unum Life Ins. Co. of America, 255 F.App'x 38 (6th Cir. 2007), the Sixth Circuit applied Sereboff to an ERISA case in which the fiduciary filed a counterclaim under the terms of a plan against the plan participant seeking reimbursement of benefits allegedly overpaid due to the participant's receipt of SSD benefits.  The court concluded that the reimbursement counterclaim was properly brought under § 502(a)(3)(B) because the plan terms specifically permitted the fiduciary to recover overpaid benefits. Id. at 45-46. The court found that the applicable plan provisions satisfied the requirements for equitable relief in Sereboff because those provisions established "a right to recover from a specific fund distinct from Gilchrest's general assets, the fund being the overpayments themselves, and a particular share of that fund to which the plan was entitled, i.e., all overpayments due to the receipt of Social Security benefits, but not to exceed the amount of benefits paid." Id.

The Court concludes that the Policy provisions regarding the right to reimbursement of overpaid benefits enable Defendant to maintain its counterclaim to obtain equitable relief based upon those terms.  See also, Gutta v. Standard Select Trust Ins. Plans, 530 F.3d 614 624 (7th Cir. 2008) (holding that a counterclaim to recover overpaid benefits, based on a nearly identical reimbursement provision, is a claim for equitable relief under §502(a)(3)).  The Policy terms here, as in Gilchrest, contain a provision asserting the right to recover from the overpayment of benefits, including overpayment resulting from the receipt of SSD benefits.  Defendant's equitable lien attaches to the overpaid disability benefits paid by Defendant and not her SSD benefits.  The fact that Plaintiff may have

disbursed or commingled Defendant's funds—thereby thwarting strict traceability—does not defeat Defendant's counterclaim.  See, Sereboff, 547 U.S. at 365.  Accordingly, as there are no factual disputes regarding the right to or the amount of overpayment, the Court finds that Defendant is entitled to a judgment for $23,332.00 (plus post-judgment interest) as a matter of law.

## V.    CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 102) is **DENIED** and Defendant's Motion for Judgment on the Administrative Record (Doc. 104; Doc. 105) is **GRANTED.**

IT IS SO ORDERED.

s/Marianne O. Battani

MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

**DATED:** February 15, 2011

### CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
Case Manager